**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 3, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

HEATHER FINSTUEN; ANNE
MAGRO; S.G.F.-M., a minor; K.B.F.-
M., a minor; GREG HAMPEL; ED
SWAYA; V.N.H.-S., a minor, LUCY
DOEL; JENNIFER DOEL; E.D., a
minor,

     Plaintiffs-Appellees,

  v.

DR. MIKE CRUTCHER, in his
official capacity as Commissioner of
Health of Oklahoma,

     Defendant-Appellant,

  and

DREW EDMONDSON, in his official
capacity as Attorney General of
Oklahoma; BRAD HENRY, in his
official capacity as Governor of
Oklahoma,

     Defendants.

No. 06-6213

---

GREG HAMPEL; ED SWAYA;
V.N.H.-S., a minor,

     Plaintiffs-Appellants,

No. 06-6216

v.

DR. MIKE CRUTCHER, in his official capacity as Commissioner of Health of Oklahoma; DREW EDMONDSON, in his official capacity as Attorney General of Oklahoma; BRAD HENRY, in his official capacity as Governor of Oklahoma,

Defendants-Appellees.

---

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. CIV-04-1152-C)**

---

Martha R. Kulmacz, Assistant Attorney General, State of Oklahoma, Oklahoma City, Oklahoma, for Defendant-Appellant in Case No. 06-6213.

Sandy Ingraham, Ingraham & Associates, McLoud, Oklahoma (Kenneth D. Upton, Jr., and F. Brian Chase, Lambda Legal Defense and Education Fund, Inc., Dallas, Texas, with her on the briefs), for Plaintiffs-Appellees in Case No. 06-6213.

Sandy Ingraham, Ingraham & Associates, McLoud, Oklahoma (Kenneth D. Upton, Jr., and F. Brian Chase, Lambda Legal Defense and Education Fund, Inc., Dallas, Texas, with her on the briefs), for Plaintiffs-Appellants in Case No. 06-6216.

Martha R. Kulmacz, Assistant Attorney General, State of Oklahoma, Oklahoma City, Oklahoma, for Defendants-Appellees in Case No. 06-6216.

---

Before **HARTZ, EBEL,** and **O'BRIEN**, Circuit Judges.

---

2

**EBEL**, Circuit Judge.

_____

Defendant-Appellant Dr. Mike Crutcher, sued in his official capacity as the Commissioner of Health (hereinafter referred to as "Oklahoma State Department of Health ('OSDH')") appeals a district court judgment that a state law barring recognition of adoptions by same-sex couples already finalized in another state is unconstitutional. OSDH also appeals the district court's order requiring it to issue a revised birth certificate for E.D., a Plaintiff-Appellee who was born in Oklahoma but adopted in California by a same-sex couple. We hold that final adoption orders by a state court of competent jurisdiction are judgments that must be given full faith and credit under the Constitution by every other state in the nation. Because the Oklahoma statute at issue categorically rejects a class of out-of-state adoption decrees, it violates the Full Faith and Credit Clause. We therefore affirm the order and judgment of the district court declaring the statute unconstitutional and directing the issuance of a new birth certificate for E. D.

I.

Three same-sex couples and their adopted children have challenged the following amendment to Oklahoma's statute governing the recognition of parent-child relationships that are created by out-of-state adoptions.

§ 7502-1.4. Foreign adoptions

> A. The courts of this state shall recognize a decree, judgment, or final order creating the relationship of parent and child by adoption, issued by a court or other governmental authority with appropriate jurisdiction in a foreign country or in another state or territory of the United States. The rights and obligations of the parties as to matters within the jurisdiction of this state shall be determined as though the decree, judgment, or final order were issued by a court of this state. Except that, this state, any of its agencies, or any court of this state shall not recognize an adoption by more than one individual of the same sex from any other state or foreign jurisdiction.

Okla. Stat. tit. 10, § 7502-1.4(A) (the "adoption amendment").

Each of the three families has a different set of circumstances. Mr. Greg Hampel and Mr. Ed Swaya are residents of Washington, where they jointly adopted child V in 2002. V was born in Oklahoma, and pursuant to an "open" adoption agreement with V's biological mother, the men agreed to bring V to Oklahoma to visit her mother "from time to time." However, they do not state any plans to move to Oklahoma or have any ongoing interactions with the state of Oklahoma. After V's adoption, Mr. Hampel and Mr. Swaya requested that OSDH issue a new birth certificate for V. OSDH did so on July 7, 2003, but named only Mr. Hampel as V's parent. Mr. Hampel and Mr. Swaya contested that action, prompting OSDH to seek an opinion from the Oklahoma attorney general as to whether it must fulfill the request to list both fathers on the birth certificate. The attorney general opined that the U.S. Constitution's Full Faith and Credit Clause required Oklahoma to recognize any validly issued out-of-state adoption decree. OSDH subsequently issued V a new birth certificate naming both men as parents.

4

The state legislature responded one month later by enacting the adoption amendment.

Lucy Doel and Jennifer Doel live with their adopted child E in Oklahoma. E was born in Oklahoma. Lucy Doel adopted E in California in January 2002. Jennifer Doel adopted E in California six months later in a second parent adoption, a process used by step-parents to adopt the biological child of a spouse without terminating the parental rights of that spouse. OSDH issued E a supplemental birth certificate naming only Lucy Doel as her mother. The Doels have requested a revised birth certificate from OSDH that would acknowledge Jennifer Doel as E's parent, but OSDH denied the request.

Anne Magro and Heather Finstuen reside in Oklahoma with their two children. Ms. Magro gave birth to S and K in New Jersey in 1998. In 2000, Ms. Finstuen adopted S and K in New Jersey as a second parent, and New Jersey subsequently issued new birth certificates for S and K naming both women as their parents.

These three families brought suit against the state of Oklahoma seeking to enjoin enforcement of the adoption amendment, naming the governor, attorney general and commissioner of health in their official capacities. The Doels also requested a revised birth certificate naming both Lucy Doel and Jennifer Doel as E's parents.

5

On cross-motions for summary judgment, the district court found that Mr. Hampel, Mr. Swaya and their child V lacked standing to bring the action. The court concluded their claimed injury – refraining from future visits to Oklahoma due to a fear that the state would not recognize their parent-child relationship – was too speculative. Finstuen v. Edmondson, No. CIV-04-1152-C, 2006 WL 1445354, at *4-5 (W.D. Okla. May 19, 2006). However, the district court granted summary judgment for the remaining plaintiffs, determining that they had standing and that the Oklahoma adoption amendment violated the Constitution's Full Faith and Credit, Equal Protection and Due Process Clauses. Id. at *5, 15-16. The court enjoined enforcement of the amendment, and ordered that a new birth certificate be issued for E. D. Id. at *16. On August 29, 2006, we stayed, pending this appeal, the order to issue a revised birth certificate.

OSDH appeals from the district court's conclusion that the Doels and the Finstuen-Magro family have standing and its ruling that the adoption amendment is unconstitutional. The Oklahoma governor and attorney general did not appeal. In addition, Mr. Hampel, Mr. Swaya and their child V timely appeal from the denial of standing, and reassert their claim that the Oklahoma amendment violates their constitutional right to travel.[1]

---

[1] OSDH claims that the Hampel-Swaya plaintiffs were not timely in their appeal. However, the Hampel-Swaya plaintiffs qualify as an "other party"

6

II.

*A. Jurisdiction*

We have statutory jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1291, 1331.  However, prior to reaching the merits, we must also establish whether the plaintiffs possess Article III standing, which requires that a plaintiff establish injury-in-fact, causation and redressability.  Opala v. Watt, 454 F.3d 1154, 1157 (10th Cir. 2006); Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005).  "While the rules for standing are less stringent for a facial challenge to a statute, a plaintiff must still satisfy the injury-in-fact requirement." PETA v. Rasmussen, 298 F.3d 1198, 1203 (10th Cir. 2002).  The injury-in-fact must be "concrete in both a qualitative and temporal sense.  The complainant must allege an injury to himself that is 'distinct and palpable,' as opposed to merely 'abstract,' and the alleged harm must be actual or imminent, not

------

[1](...continued)
pursuant to Fed. R. App. P. 4(a)(3), which states, "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed . . . ."  See Smith v. Vigortone Ag Prods., Inc., No. 91-3351, 1992 U.S. App. LEXIS 28567, at *3 (10th Cir. Oct. 22, 1992) (unpublished); Crystal Palace Gambling Hall, Inc. v. Mark Twain Indus., Inc., 817 F.2d 1361, 1364 (9th Cir. 1987); 20 James Wm. Moore et al., Moore's Federal Practice ¶ 304.11[3][a] (3d ed. 1999).  Therefore, the Hampel-Swaya plaintiffs' notice of appeal, which was filed on June 26, 2006, was timely because it was filed within 14 days of OSDH's notice of appeal on June 16, 2006.

7

'conjectural' or 'hypothetical.'" Whitmore v. Arkansas, 495 U.S. 149, 155 (1990) (citations, alteration omitted).

The Supreme Court elaborated on the "imminence" requirement in Lujan v. Defenders of Wildlife: "[a]lthough 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes -- that the injury is 'certainly impending.'" 504 U.S. 555, 564 n.2 (1992) (quotation omitted). In a plea for injunctive relief, a plaintiff cannot maintain standing by asserting an injury based merely on "subjective apprehensions" that the defendant might act unlawfully. City of Los Angeles v. Lyons, 461 U.S. 95, 107 n.8 (1983). "The emotional consequences . . . simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant." Id.

"Whether a plaintiff has standing is a legal question, which we review de novo." Lippoldt v. Cole, 468 F.3d 1204, 1216 (10th Cir. 2006). The district court here decided the questions of standing on cross-motions for summary judgment. "On cross-motions for summary judgment, our review of the summary judgment record is de novo and we must view the inferences to be drawn from affidavits, attached exhibits and depositions in the light most favorable to the party that did not prevail." Jacklovich v. Simmons, 392 F.3d 420, 425 (10th Cir. 2004). "Summary judgment is appropriate 'if the pleadings, depositions, answers

8

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Id. at 426 (quoting Fed. R. Civ. P. 56(c)). "Unsupported conclusory allegations, however, do not create an issue of fact." MacKenzie v. Denver, 414 F.3d 1266, 1273 (10th Cir. 2005); see also Salehpoor v. Shahinpoor, 358 F.3d 782, 789 (10th Cir. 2004) (same).

We agree with the district court that the Hampel-Swaya family lacks an injury sufficiently immediate to establish standing. Mr. Hampel and Mr. Swaya argue that they are obligated under the open adoption agreement with V's mother to bring V to Oklahoma, and have refrained from this travel because of a fear that something will happen during their visit that could require Oklahoma agencies to consider the legality of their parent-child relationship. They contend that the potential harm from a failure to recognize Mr. Hampel and Mr. Swaya as V's parents infringes on their constitutional right to travel. See Saenz v. Roe, 526 U.S. 489, 500 (1999) (referring to the right to travel as "the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.").

9

However, the Hampel-Swaya plaintiffs do not establish the circumstances in which the non-recognition of the adoption would arise. Oklahoma has already issued a revised birth certificate for V, and the Hampel-Swaya family does not claim that it is seeking additional benefits from the state. Ordinary travel generally does not require a state to examine the legitimacy of an asserted parent-child relationship. Although a medical emergency might create a scenario in which parental consent is required, such a situation is merely hypothetical, as opposed to an actual or impending contact with Oklahoma authorities that could jeopardize the rights of any member of the Hampel-Swaya family. Such guesswork invokes Lyons' admonition that "[i]t is the reality of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." 461 U.S. at 107 n.8. The Hampel-Swaya family's alleged injuries are simply too speculative to support Article III's injury-in-fact requirement for standing.

The Finstuen-Magro family, though residing in Oklahoma, similarly fails to satisfy the injury-in-fact requirement for standing. Ms. Magro is the biological mother of children S and K. Therefore, her parental rights cannot be jeopardized by the Oklahoma amendment, and S's and K's rights that flow from that relationship are not threatened. Ms. Finstuen states that she fears having her parent-child relationship invalidated, and this fear causes her to avoid signing

10

forms and papers – such as school permission slips or medical releases – that could trigger a question about her legitimacy as a parent. She also states that S and K are fearful due to her uncertain parental status, and that they have become more "clingy" and are "increasingly concerned about when and whether she will come home."

But Ms. Finstuen recites no encounter with any public or private official in which her authority as a parent was questioned. Most importantly, she has not established that the amendment creates an actual, imminent threat to her rights as a parent or the rights of her adopted children, because she is not presently seeking to enforce any particular right before Oklahoma authorities. The Finstuen-Magro plaintiffs, therefore, also fail to state a sufficient injury to confer standing under Article III for this suit.[2]

In contrast, the district court correctly held that the Doels have standing under Article III. OSDH has refused to revise E's birth certificate to add Jennifer Doel's name as a parent, and thus both Jennifer and E state an injury-in-fact. In addition, Jennifer and Lucy Doel recount an encounter with medical emergency

---

[2] The district court erroneously directed OSDH to issue new birth certificates for the Magro-Finstuen plaintiffs. However, the children of Ms. Magro and Ms. Finstuen were born in New Jersey, and these plaintiffs do not claim they are entitled to birth certificates for Oklahoma-born children. Therefore, we reverse the district court's order to the extent it directs issuance of new birth certificates for the Magro-Finstuen plaintiffs.

staff in which they were told by both an ambulance crew and emergency room personnel that only "the mother" could accompany E and thus initially faced a barrier to being with their child in a medical emergency. This incident too constitutes a concrete, particularized injury.

In addition to stating an injury-in-fact, the Doels must meet the causation and redressability prongs of Article III standing. "[T]here must be a causal connection between that injury and the challenged action of the defendant -- the injury must be 'fairly traceable' to the defendant. . . it must be likely, not merely speculative, that a favorable judgment will redress the plaintiff's injury." Nova Health Sys, 416 F.3d at 1154. OSDH argues that the Doels sought a birth certificate for E just before the legislature enacted the adoption amendment, and that OSDH denied the request because of a separate statutory requirement that only the name of E's father be placed in the "father" designation on a birth certificate. Under OSDH's theory, the Doels would lack standing, because the adoption amendment did not cause the state to issue a one-parent, rather than a two-parent, birth certificate.[3]

---

[3] OSDH did not raise this argument before the district court. "[T]he general rule [is] that an appellate court will not consider an issue raised for the first time on appeal . . . ." Hicks v. Gates Rubber Co., 928 F.2d 966, 970 (10th Cir. 1991). However, jurisdictional issues are among the exceptional questions that we will hear even though they were not raised below. Rademacher v. Colo. Ass'n of Soil Conservation Dists. Med. Benefit Plan, 11 F.3d 1567, 1571-72 (10th

(continued...)

12

We are not persuaded that OSDH's rationale for denying a new birth certificate was unrelated to the adoption amendment. As an initial matter, we do not assume for the purposes of standing analysis that OSDH's stated reason for denying the birth certificate was the only cause – or even an actual cause – of OSDH's action, particularly given that the statute governing the identity of fathers on birth certificates appears to apply to live births rather than supplemental adoptive birth certificates.[4] Indeed, when the Oklahoma attorney general opined in March 2004 that the Full Faith and Credit Clause required OSDH to issue a new birth certificate to same-sex adoptive parents who adopt an Oklahoma-born child, that opinion referred to the statute governing supplemental, rather than original, birth certificates. Moreover, correspondence in the record on appeal indicates that

---

[3](...continued)
Cir. 1993). To the extent OSDH's new arguments implicate our Article III jurisdiction, we will therefore address them. However, OSDH has waived the opportunity to present these belated explanations as a defense on the merits of the Doels' allegations.

[4] The statute cited by OSDH as the basis for denying E. D.'s birth certificate governs the initial birth certificate issued "within seven (7) days after the birth" for "each live birth which occurs in this state." Okla. Stat. tit. 63, § 1-311(A). Thus, it appears to be wholly inapplicable to the supplementary birth certificates that must be issued to adoptive parents under Okla. Stat. tit. 10, § 7505-6.6(B) and Okla. Stat. tit. 63, § 1-316(A). Even if Section 1-311 could be deemed to apply to adoptive parents, it requires that the father's name be listed on the birth certificate only "[i]f the mother was married at the time of conception and birth." Okla. Stat. tit. 63, § 1-311(D)(1). Nothing in the record indicates that either of the Doel mothers were "married at the time of conception and birth," and so it is unclear why the Department would have applied this statute to Jennifer Doel's request for a new birth certificate for E.

13

OSDH received and denied Jennifer Doel's initial request while OSDH was waiting for the attorney general's opinion as to whether it must issue new birth certificates for same-sex parent adoptions. The Doels responded by renewing their request two months after the legislature enacted the adoption amendment, and OSDH again denied the request. The Doels then wrote OSDH through counsel to explain the validity of Jennifer Doel's request to be listed on E's birth certificate, but apparently to no avail.

Nothing in the record refutes the Doels' claim that the adoption amendment is the reason why OSDH has not yet issued a new birth certificate for E. To the contrary, the record before us strongly suggests that the amendment was the reason for the denial. OSDH's argument that a separate statute bars issuance of a new birth certificate is undermined by the clear language of the statute itself. Instead, by asserting that OSDH had an entirely different reason for denying the Doels' birth certificate request, OSDH attempts to insert a new "fact" in its appeal from summary judgment. "Unsupported conclusory allegations . . . do not create an issue of fact." MacKenzie, 414 F.3d at 1273.[5] We therefore conclude that the

---

[5] This conclusion is consistent with our review of motions for summary judgment. We have said "[w]e will disregard a contrary affidavit . . . when it 'constitutes an attempt to create a sham fact issue.'" Burns v. Bd. of County Comm'rs, 330 F.3d 1275, 1282 (10th Cir. 2003) (quoting Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986)). One of the factors in deciding whether a party is trying to create a "sham" factual issue is "whether the affiant had access to the

(continued...)

14

Doels' stated injury is "fairly traceable to the defendant," and that a judgment

invalidating the adoption amendment and ordering a new birth certificate will

make it "likely, not merely speculative, that a favorable judgment will redress the

plaintiff's injury." Nova Health Sys, 416 F.3d at 1154 (quotation omitted).

Moreover, the Doels brought an equal protection claim claiming that

Jennifer and Lucy Doel were injured when they were told that only "the mother"

could accompany child E in a medical emergency. In equal protection claims, "the

injury is the imposition of the barrier itself." Buchwald v. Univ. of N.M. Sch. of

Med., 159 F.3d 487, 493 (10th Cir. 1998). We have not decided this appeal on

equal protection grounds, but that is irrelevant for purposes of our standing

analysis. "We do not address the merits of plaintiff's claims in our determination

of standing." Id.; see also Initiative & Referendum Inst. v. Walker, 450 F.3d

---

[5](...continued)
pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence." Id. (quotation omitted). "[T]he utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony." Franks, 796 F.2d at 1237.

In this case, OSDH produced no evidence below as to why it denied the Doels' their birth certificate, and so we have no occasion to compare conflicting affidavits or documents. Nonetheless, OSDH's evidence presented for the first time on appeal that it relied on another statute to deny the Doels' their requested certificate is an "attempt to create a sham fact issue," Burns, 330 F.3d at 1282 (quotation omitted). OSDH presumably "had access to the pertinent evidence at the time" of the earlier proceedings, and OSDH does not argue that its position is based on "newly discovered evidence." Id. (quotation omitted).

15

1082, 1085, 1088 (10th Cir. 2006) (en banc) (in holding that the plaintiffs had standing in a First Amendment case that alleged they were injured by the "chilling effect" of a provision of the Utah Constitution, "[f]or purposes of the standing inquiry, the question is not whether the alleged injury rises to the level of a constitutional violation."). It is clear that the adoption amendment is the codification of a general policy not to recognize the parent-child relationship of same-sex parents, and the Doels have stated that this policy caused their injury. Thus, the Doels have standing under Article III to claim that the Oklahoma adoption amendment is unconstitutional and to request a revised birth certificate for E naming Jennifer Doel as a parent.

OSDH also argues, for the first time on appeal, that the Doels lack prudential standing. "The standing inquiry requires us to consider both constitutional limits on federal-court jurisdiction and prudential limitations on its exercise." Bd. of County Comm'rs v. Geringer, 297 F.3d 1108, 1111 (10th Cir. 2002) (quotations omitted). Prudential standing requires, among other things, that "a plaintiff's grievance . . . arguably fall[s] within the zone of interests protected or regulated by the statutory provision . . . invoked in the suit." Id. at 1112 (quotation omitted).

Prudential standing is not jurisdictional in the same sense as Article III standing. See, e.g., id. at 1112 (observing that, unlike Article III standing,

16

prudential standing is a "judicially-created set of principles"); Grubbs v. Bailes, 445 F.3d 1275, 1280-81 (10th Cir. 2006) (adhering to the strict requirements of Article III but declining to "definitively resolve" plaintiff's prudential standing). Instead, "[q]uestions relating to prudential standing . . . may be pretermitted in favor of a straightforward disposition on the merits." Id., 445 F.3d at 1281. We could therefore decline to address this argument, as it was not raised in the court below. See Shell Rocky Mountain Prod., LLC v. Ultra Res., Inc., 415 F.3d 1158, 1164 (10th Cir. 2005) ("As a general rule, we do not review matters raised for the first time on appeal."). However, to the extent OSDH attempts to bootstrap its prudential standing argument into a mootness question, which is jurisdictional, we must address whether the adoption amendment applies to the Doels. See Building & Constr. Dep't v. Rockwell Int'l Corp., 7 F.3d 1487, 1491 (10th Cir. 1993) ("Constitutional mootness doctrine is grounded in the Article III requirement that federal courts only decide actual, ongoing cases or controversies." (quotation omitted)).

OSDH argues that the adoption amendment applies only to an adoption by a same-sex couple that occurs in a single proceeding. Under OSDH's litigating interpretation, the phrasing of "an adoption" in the singular under Okla. Stat. tit. 10, § 7502-1.4(A) ("this state, any of its agencies, or any court of this state shall not recognize an adoption by more than one individual of the same sex from any

17

other state or foreign jurisdiction") means the statute does not apply to a child who is adopted by one person in a same-sex couple and then, in another proceeding, by the second person in the couple. OSDH thus argues that the amendment does not apply to the Doels because they utilized such a second parent adoption procedure.

When we are called upon to interpret state law, we "must look to rulings of the highest state court, and if no such rulings exist, must endeavor to predict how the high court would rule." Lovell v. State Farm Mut. Auto. Ins. Co., 466 F.3d 893, 899 (10th Cir. 2006). The adoption amendment has not been interpreted by Oklahoma courts in any published case. Therefore, "[w]e interpret state laws according to state rules of statutory construction." Ward v. Utah, 398 F.3d 1239, 1248 (10th Cir. 2005). Oklahoma courts construe statutes according to the legislative intent as expressed in both the language and purpose of the statute:

> In determining whether a statute applies to a given set of facts, we focus on legislative intent which controls statutory interpretation. Intent is ascertained from the whole act in light of its general purpose and objective considering relevant provisions together to give full force and effect to each. The Court presumes that the Legislature expressed its intent and that it intended what it expressed. Statutes are interpreted to attain that purpose and end championing the broad public policy purposes underlying them. Only where the legislative intent cannot be ascertained from the statutory language, i.e. in cases of ambiguity or conflict, are rules of statutory construction employed.

Keating v. Edmondson, 37 P.3d 882, 886 (Okla. 2001) (footnotes omitted). "[T]he cardinal rule is to begin with consideration of the language used." Haney v. Oklahoma, 850 P.2d 1087, 1089 (Okla. 1993). "The words, phrases and sentences

18

of a statute are to be understood as used, not in any abstract sense.  Words used in a part of a statute must be interpreted in light of their context and understood in a sense which best harmonizes with all other parts of the statute."  In re Estate of Mae Little Bear, 909 P.2d 42, 50 (Okla. 1995) (citations omitted).  The public policy codified by the adoption amendment was plainly meant to prevent recognition of adoptions by same-sex couples[6], and we discern nothing from the statutory language or legislative history indicating that the legislature intended to exclude adoptions of a child by a same-sex couple that take place in more than one proceeding.  The plain language of the statute bars recognition of the legal act of adoption generally, as opposed to merely barring the recognition of a subcategory

[6] Oklahoma lacks a rigorous record of legislative history documenting the impetus and rationale for the adoption amendment.  However, the Oklahoma House of Representatives published a media release statement on the date of the amendment's passage stating that under the bill "[o]ut-of-state adoptions by homosexual couples would not be recognized in Oklahoma."  See *Republican Legislators Applaud Passage of Bill to Prevent State Recognition of Same-Sex Adoptions*, Okla. House of Reps. Media Div., April 26, 2004, available at http://www.lsb.state.ok.us/house/news6772.html, last viewed July 31, 2007.  The press release states that the legislation was designed to reverse the attorney general's opinion that the state was "obligated to recognize out-of-state adoptive parent/child relationships."  Id.  The bill "would specifically prohibit the issuance of an Oklahoma birth certificate to parents who are of the same sex."  Id.  In the press release, Rep. Thad Balkman summarized the amendment as "protect[ing] children from being targeted for adoption by gay couples."  Id.  He also is quoted as stating, "I believe children are better off with two parents – a mother and a father – not two fathers or two mothers."  Id.

In district court proceedings, OSDH conceded that the adoption amendment "provide[s] a clear legislative expression of Oklahoma's public policy contrary to adoptions by same sex couples."

19

of adoption proceedings involving both parents in a single proceeding. Elsewhere in the Oklahoma adoption code, the legislature refers to a "proceeding" rather than the more general word of "adoption" when it intends to set forth rules for a particular adoption proceeding. See, e.g., Okla. Stat. tit. 10, §§ 7502-1.1 (describing state courts' jurisdiction over adoption proceedings), 7502-1.2 (describing the proper venue for adoption proceedings), 7502-1.3(B) (distinguishing between a "permanent relinquishment of a child for adoption" and the "proceedings" recognizing that relinquishment). The legislature surely would have used a more specific phrase than "an adoption" if it had intended the statute to refer only to a single adoption proceeding involving both adoptive parents in a same-sex couple. Cf. Jama v. Immigration & Customs Enforcement, 543 U.S. 335, 341 (2005) (noting the Court's "reluctance" to assume that Congress intended a specific meaning in a statute "when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest").

There is absolutely nothing in the record suggesting that the Oklahoma legislature would find same-sex adoptions more acceptable if they occurred one parent at a time, rather than by both parents at the same time. Indeed, OSDH's position in litigation is discredited by an Oklahoma case interpreting the statute governing eligibility to adopt a child in Oklahoma. The state court of civil appeals held that the statute, Okla. Stat. tit. 10, § 7503-1.1, categorically denies unmarried

20

couples eligibility to adopt a child, even though it permits single individuals to adopt. In re Adoption of M.C.D., 42 P.3d 873, 878, 881-82 (Okla. Civ. App. 2001). It was irrelevant for purposes of determining eligibility that the individuals in the unmarried couple had filed separate petitions to adopt the child in question. The court specifically concluded that permitting two unmarried people to categorize themselves as "single individuals" in order to adopt would be contrary to legislative intent. Id. at 881-82 & n.6. It seems highly unlikely that the Oklahoma legislature intended the adoption amendment at issue here to depart from that policy. OSDH has provided no authority to support its interpretation advanced only in litigation. Accordingly, we cannot conclude here that the statute does not apply to sequential adoptions by same-sex couples.[7] Thus, OSDH's argument that the Doels lack prudential standing fails.

In addition, we must address whether OSDH's position on the adoption amendment's applicability renders the case moot. At oral argument, OSDH "conceded" that the adoption amendment does not apply to the Doels for the reasons stated above. The question is whether OSDH's concession means that it has "ceased its offending conduct" in a way that would moot the appeal. Adarand

---

[7] We observe, of course, that we "lack jurisdiction authoritatively to construe state legislation," United States v. Thirty-Seven (37) Photographs, 402 U.S. 363, 369 (1971), and as such our interpretation does not bind Oklahoma courts.

21

Constructors, Inc. v. Slater, 528 U.S. 216, 222 (2000).[8] "[T]he Supreme Court has said that a case properly brought in the first instance only becomes moot where 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" Building & Constr. Dep't, 7 F.3d at 1491 (quoting County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)). "The burden of demonstrating mootness is a heavy one," County of Los Angeles, 440 U.S. at 631 (quotation omitted), and it "lies with the party asserting mootness," Adarand Constructors, 528 U.S. at 222 (quotation, emphasis omitted).

An authoritative promise that the state of Oklahoma will not apply the adoption amendment to sequential adoptions theoretically could moot OSDH's appeal. However, OSDH's "concession" cannot be construed as such a promise, because it has not demonstrated the authority to act on behalf of the state in doing

---

[8] OSDH raises this issue in the context of Article III standing. It seems that an argument based on a state agency's construction of a statute made only in the context of adversarial litigation asks us to "confuse[] mootness with standing," Adarand Constructors, 528 U.S. at 221 (quotation omitted). In Adarand Constructors, when a government agency decided during litigation to grant a petitioner relief that, if provided prior to litigation, would have denied him standing, the Court held it was an issue of mootness on the appeal, not jurisdictional standing. Id. at 221-22; see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 190-92 (2000) (detailing the distinctions between standing and mootness, specifically that the defendant rather than plaintiff has the burden of proving mootness).

Therefore, the question of whether OSDH's new statutory interpretation affects our jurisdiction is squarely a question of whether OSDH has mooted its own appeal.

so. The adoption amendment is universal in that it binds the "state, any of its agencies, [and] any court of this state." Okla. Stat. tit. 10, § 7502-1.4(A). Dr. Crutcher, as Commissioner of Health and head of OSDH, does not argue that he has inherent authority to interpret adoption statutes on behalf of the state, nor even the authority to bind his successors at OSDH.[9] Adoption statutes – including the one at issue here – determine rights and responsibilities involving medical consent and educational decisions, the right to bring a wrongful death suit, the right to seek child support, the right to inherit, and other critical rights. Dr. Crutcher's statutory responsibilities as Commissioner of Health do not include the legal authority to determine the legitimacy of parent-child relationships under these statutes.[10] Moreover, the adoption amendment expressly applies to the judiciary as well as the executive branch of the Oklahoma government.

---

[9] "Th[e] contemporaneous construction of the executive officers charged with administering the provisions of the [act] is entitled to great respect by the courts, although it is, of course, not controlling." Estate of Mae Little Bear, 909 P.2d at 50. But the legislature did not direct the Commissioner of Health to assume any unique administrative responsibilities with respect to the amendment.

[10] The statutory responsibilities of the Commissioner of Health include: "general supervision of the health of the citizens of the state;" Okla. Stat. tit. 63, § 1-106(B)(1); public health and safety investigations, id.; prevention, control and suppression of the spread of infectious diseases, id.; and administration of the statewide system of vital statistics, id., § 1-304. In addition, OSDH includes a number of statutorily-created offices, such as the Office of Child Abuse Prevention, that engage in statewide planning and monitoring of local programs. See id., § 1-227. None of these authorities encompass an administrative ability to determine the legal parents of an adopted child.

23

Furthermore, to permit an executive agency to moot an appeal by virtue of a statutory interpretation advanced only in the context of adversarial litigation, rather than a rule-making or other appropriate mechanism authorized by the legislature, would violate the Oklahoma Constitution's provision for separation of powers. See Okla. Const. § IV-1 ("The powers of the government of the State of Oklahoma shall be divided into three separate departments: The Legislative, Executive, and Judicial; . . . [these] departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others."). "The judicial branch is tasked with the responsibility of interpreting the policy as enacted into our statutory structure and ensuring those statutes conform to state and federal constitutional requirements." Fields v. Driesel, 941 P.2d 1000, 1008 (Okla. Crim. App. 1997); see also Volkswagenwerk Aktiengesellschaft v. Fed. Maritime Comm'n, 390 U.S. 261, 272 (1968) ("[c]ourts are the final authorities on issues of statutory construction."). As such, permitting a so-called concession of statutory interpretation, such as the one offered here, to moot a case would usurp the judiciary's power to resolve what the adoption amendment means as a matter of law.[11]

---

[11] In addition, Dr. Crutcher's "concession" arguably violates separation of powers by encroaching on the legislature's ability to enact laws furthering its policy decisions, given our conclusion above that the adoption amendment is intended to apply to all out-of-state adoptions by same-sex couples.

24

OSDH also has offered the Doels no relief that would moot the case. The Doels still have no revised birth certificate, nor do they have any enforceable assurance that OSDH will not apply the adoption amendment to them in the future. This is not a situation in which "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Building & Constr. Dep't, 7 F.3d at 1491 (quotation omitted).

Finally, the odd posture of the appeal – in which the Commissioner of Health, but not the Governor or Attorney General, has appealed the district court's declaratory judgment and injunction – does not render the appeal moot. Dr. Crutcher as Commissioner of Health was an appropriately-named defendant. "Under Ex parte Young, the state officer against whom a suit is brought 'must have some connection with the enforcement of the act' that is in continued violation of federal law. So long as there is such a connection, it is not necessary that the officer's enforcement duties be noted in the act." Dairy Mart Convenience Stores, Inc. v. Nickel, 411 F.3d 367, 372-73 (2d Cir. 2005) (citing Ex Parte Young, 209 U.S. 123, 154, 157 (1908)). Dr. Crutcher, in his official capacity as Commissioner of Health, is the named defendant most directly responsible for the birth certificate that the Doels have requested and that is the subject of a stayed district court order. Nothing in Ex Parte Young requires that any appeal of a lower court's judgment involve all named state defendants. In this situation, the

25

Commissioner of Health may have interests as a state officer that are independent of the other parties, because he is appointed by the Board of Health, not the Governor, and serves at the Board's pleasure. Okla. Stat. tit. 63, § 1-106(A). We are satisfied that Dr. Crutcher, as Commissioner of Health and head of OSDH, enjoys unique authorities and responsibilities to enable him to appeal independently from the Governor or Attorney General. Therefore, this appeal is not moot.

*B. Full Faith and Credit Clause*

Having established jurisdiction, we proceed to consider the merits of OSDH's appeal. The district court concluded that the adoption amendment was unconstitutional because the Full Faith and Credit Clause requires Oklahoma to recognize adoptions – including same-sex couples' adoptions – that are validly decreed in other states. "We review challenges to the constitutionality of a statute de novo." Powers v. Harris, 379 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted). We affirm, because there is "no roving 'public policy exception' to the full faith and credit due judgments," Baker ex rel. Thomas v. Gen. Motors Corp. 522 U.S. 222, 233 (1998), and OSDH presents no relevant legal argument as to why the Doels' out-of-state adoption judgments should not be recognized under the Full Faith and Credit Clause.

The Constitution states that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." U.S. Const. art. 4, § 1. The Supreme Court has often explained the purpose and policies behind the Full Faith and Credit Clause.

> The very purpose of the full faith and credit clause was to alter the status of the several states as independent foreign sovereignties, each free to ignore obligations created under the laws or by the judicial proceedings of the others, and to make them integral parts of a single nation throughout which a remedy upon a just obligation might be demanded as of right, irrespective of the state of its origin.

Milwaukee County v. M. E. White Co., 296 U.S. 268, 276-77 (1935). The Clause is designed "to preserve rights acquired or confirmed under the public acts and judicial proceedings of one state by requiring recognition of their validity in other states." Pac. Employers Ins. Co. v. Indus. Accident Comm'n, 306 U.S. 493, 501 (1939). The Clause "is one of the provisions incorporated into the Constitution by its framers for the purpose of transforming an aggregation of independent, sovereign States into a nation. If in its application local policy must at times be required to give way, such is part of the price of our federal system." Sherrer v. Sherrer, 334 U.S. 343, 355 (1948) (quotation, footnote omitted). "To vest the power of determining the extraterritorial effect of a State's own laws and judgments in the State itself risks the very kind of parochial entrenchment on the interests of other States that it was the purpose of the Full Faith and Credit Clause

27

and other provisions of Art. IV of the Constitution to prevent." <u>Thomas v. Wash.</u>

<u>Gas Light Co.</u>, 448 U.S. 261, 272 (1980).

In applying the Full Faith and Credit Clause, the Supreme Court has drawn a distinction between statutes and judgments. <u>Baker</u>, 522 U.S. at 232-33. Specifically, the Court has been clear that although the Full Faith and Credit Clause applies unequivocally to the judgments[12] of sister states, it applies with less force to their statutory laws. <u>Id.</u>; <u>see also</u> <u>Nevada v. Hall</u>, 440 U.S. 410, 421-22 (1979) (holding that California was not required to apply Nevada's statutory cap on monetary damages in tort actions against the state when the accident involving a state employee occurred in California); <u>Pac. Employers Ins. Co.</u>, 306 U.S. at 497, 502-05 (concluding that California courts could apply California rather than Massachusetts law in a worker's compensation action, even though the employee injured in California was usually stationed in Massachusetts).

However, with respect to final judgments entered in a sister state, it is clear there is no "public policy" exception to the Full Faith and Credit Clause:

> Regarding judgments . . . the full faith and credit obligation is exacting.
> A final judgment in one State, if rendered by a court with adjudicatory

---

[12] Despite the fact that courts may use different words, such as "decree" or "order," to refer to final adoption decisions, it is clear that all such decisions are "judgments" under the common definition of the term as a "court's final determination of the rights and obligations of the parties in a case. The term <u>judgment</u> includes an equitable decree and any order from which an appeal lies." Black's Law Dictionary (8th ed. 2004) (citing Fed. R. Civ. P. 54).

28

authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land. For claim and issue preclusion (res judicata) purposes, in other words, the judgment of the rendering State gains nationwide force. . . .

A court may be guided by the forum State's 'public policy' in determining the law applicable to a controversy. But our decisions support no roving 'public policy exception' to the full faith and credit due judgments.

Baker, 522 U.S. at 232-33 (citations, footnotes omitted); see also Franchise Tax Bd. v. Hyatt, 538 U.S. 488, 494 (2003) (reiterating the command of Baker).

In numerous cases th[e] [Supreme] Court has held that credit must be given to the judgment of another state although the forum would not be required to entertain the suit on which the judgment was founded; that considerations of policy of the forum which would defeat a suit upon the original cause of action are not involved in a suit upon the judgment and are insufficient to defeat it.

Milwaukee County, 296 U.S. at 277 (holding that a judgment for taxes in Wisconsin was enforceable in Illinois under the Full Faith and Credit Clause). "We are aware of no . . . considerations of local policy or law which could rightly be deemed to impair the force and effect which the full faith and credit clause and the Act of Congress require to be given to . . . a judgment outside the state of its rendition." Magnolia Petroleum Co. v. Hunt, 320 U.S. 430, 438 (1943), overruled on other grounds by Thomas, 448 U.S. at 286.

OSDH stops short of arguing that the Full Faith and Credit Clause permits states to invoke a "policy exception," but contends that requiring Oklahoma to recognize an out-of-state adoption judgment would be tantamount to giving the

29

sister state control over the effect of its judgment in Oklahoma. Specifically, OSDH argues that the recognition of adoptive status in Oklahoma would extend the gamut of rights and responsibilities to the parents and child of the adoption order, including the right of a child to inherit from his parents, and therefore would constitute an impermissible, extra-territorial application of California law in Oklahoma. OSDH argues that inheritance is an Oklahoma property right which California courts lack the power to confer.

OSDH's argument improperly conflates Oklahoma's obligation to give full faith and credit to a sister state's judgment with its authority to apply its own state laws in deciding what state-specific rights and responsibilities flow from that judgment. In Baker, the Supreme Court drew the distinction between the mandate to give full faith and credit to another state's equity decree and the forum state's options for enforcing that decree:

> The Court has never placed equity decrees outside the full faith and credit domain. . . .
>
> Full faith and credit, however, does not mean that States must adopt the practices of other States regarding the time, manner, and mechanisms for enforcing judgments. Enforcement measures do not travel with the sister state judgment as preclusive effects do; such measures remain subject to the even-handed control of forum law. See McElmoyle ex rel. Bailey v. Cohen, 13 Peters 312, 325 (1839) (judgment may be enforced only as "laws [of enforcing forum] may permit"); see also Restatement (Second) of Conflict of Laws § 99 (1969) ("The local law of the forum determines the methods by which a judgment of another state is enforced.").

<u>Baker</u>, 522 U.S. at 234-35. The Court explained, as an example, that "a sister State's decree concerning land ownership in another State has been held ineffective to transfer title," even if the decree would have a preclusive effect against the parties in any further adjudication of the property rights. <u>Id.</u> at 235 (emphasis omitted).

A California court made the decision, in its own state and under its own laws, as to whether Jennifer Doel could adopt child E. That decision is final. If Oklahoma had no statute providing for the issuance of supplementary birth certificates for adopted children, the Doels could not invoke the Full Faith and Credit Clause in asking Oklahoma for a new birth certificate. However, Oklahoma has such a statute – i.e., it already has the necessary "mechanism[] for enforcing [adoption] judgments." <u>See</u> <u>id.</u> The Doels merely ask Oklahoma to apply its own law to "enforce" their adoption order in an "even-handed" manner. <u>See</u> <u>id.</u>

Oklahoma continues to exercise authority over the manner in which adoptive relationships should be enforced in Oklahoma and the rights and obligations in Oklahoma flowing from an adoptive relationship. And Oklahoma has spoken on that subject:

> After the final decree of adoption is entered, the relation of parent and child and all the rights, duties, and other legal consequences of the natural relation of child and parent shall thereafter exist between the adopted child and the adoptive parents of the child and the kindred of the adoptive parents. From the date of the final decree of adoption, the child shall be entitled to inherit real and personal property from and

31

through the adoptive parents in accordance with the statutes of descent and distribution. The adoptive parents shall be entitled to inherit real and personal property from and through the child in accordance with said statutes.

After a final decree of adoption is entered, the biological parents of the adopted child, unless they are the adoptive parents or the spouse of an adoptive parent, shall be relieved of all parental responsibilities for said child and shall have no rights over the adopted child or to the property of the child by descent and distribution.

Okla. Stat. tit. 10, § 7505-6.5(A) and (B). By way of illustration, the right of a parent in Oklahoma to authorize medical treatment for her minor child, id., § 170.1, extends by virtue of § 7505-6.5 to adoptive parents as well. Whatever rights may be afforded to the Doels based on their status as parent and child, those rights flow from an application of Oklahoma law, not California law.

OSDH argues that Oklahoma is not bound by the Full Faith and Credit Clause to recognize out-of-state adoptions to which the Commissioner of Health was not a party. OSDH, citing Estin v. Estin, 334 U.S. 541 (1948), observes that a judgment rendered in a sister state may be enforced in Oklahoma only if the original court in the sister state had personal jurisdiction over the parties to the judgment. Thus OSDH contends it has no constitutional obligation to recognize California's adjudication of the Doels' adoption because no Oklahoma official was a party to the California adoption, and therefore the California court ordering the adoption had no personal jurisdiction over any Oklahoma official to enforce the order against such an official.

32

OSDH's theory misconstrues the Doels' lawsuit and the role of the state being asked to give full faith and credit to a sister state's prior judgment. The Doels do not seek to <u>enforce</u> their adoption order <u>against</u> Dr. Crutcher in his official capacity for the state of Oklahoma as a matter of claim or issue preclusion. Instead, the Doels assert in their Oklahoma suit that Dr. Crutcher and OSDH are obligated under Oklahoma law to issue a supplemental birth certificate and that they have failed to fulfill the constitutionally-imposed duty on states to recognize another state's judgment. In the course of that adjudication, of course, OSDH must be mindful of the parties' substantive constitutional rights, one of which is that the Doels' final judgment in California adjudicating their status as adoptive parents be given full faith and credit. The rights that the Doels seek to enforce in Oklahoma are Oklahoma rights and the Doels have clearly established jurisdiction over Dr. Crutcher and OSDH in Oklahoma, such that the United States District Court for the Western District of Oklahoma can adjudicate those rights. OSDH's argument would vitiate the Full Faith and Credit Clause by seemingly requiring each state in the nation to be a party to the original action in a sister state in order for the resulting judgment to be enforced across the country. The absurdity of the argument is obvious.[13]

---

[13] OSDH also attempts to raise several related arguments for the first time on appeal.

(continued...)

OSDH makes no persuasive argument as to why the Full Faith and Credit

Clause of the Constitution should not apply to its recognition of out-of-state

adoption orders.  Indeed, many courts – including Oklahoma's Supreme Court –

have  determined that the Full Faith and Credit Clause applies to valid adoption

decrees from other states.

> The validity of the Arkansas decree is not called in question, therefore the same is entitled to full faith and credit under the Federal Constitution, Art. 4, § 1. 1 Am. Jur. 627, sec. 10.

> As stated in American Law Institute's Restatement of the Law of Conflict of Laws, sec. 143, "The status of adoption, created by the law of a state having jurisdiction to create it, will be given the same effect

---

[13](...continued)
 First, OSDH contends that the California adoption order is invalid because it failed to make explicit findings of subject matter jurisdiction, namely the petitioner's domicile and personal appearance, an argument severely undermined by notations on the adoption order itself.  OSDH further argues that Dr. Crutcher as Commissioner of Health is not bound by findings of the California proceedings that were not "truly litigated."  OSDH contends that the Full Faith and Credit Clause is only triggered when a state court, as opposed to a state agency, is asked to acknowledge the out-of-state adoption, and that no plaintiff in this case has sought such action from an Oklahoma court.  OSDH also argues that the Doels have failed to demonstrate that they would be entitled to the requested birth certificate in California, and therefore OSDH is not according the Doels' adoption "less credit" than California would provide.  OSDH's last new argument is that adoption orders are not "final," because findings of a child's best interests are not "final," and therefore Oklahoma need not accord such orders full faith and credit.
 We do not consider such new theories belatedly advanced in litigation. Bancamerica Commercial Corp. v. Mosher Steel of Kan., Inc., 100 F.3d 792, 798-99 (10th Cir. 1996).  Furthermore, without deciding any of these issues, we observe that the arguments lack support from any relevant authority and none appear to have merit.

in another state as is given by the latter state to the status of adoption when created by its own law."

Ex parte Moulin, 217 P.2d 1029, 1031 (Okla. 1950); see also In re Male Child Born July 15, 1985 to L.C., 718 P.2d 660, 665 (Mont. 1986); Wachovia Bank and Trust Co., N.A. v. Chambless, 260 S.E.2d 688, 692 (N.C. Ct. App. 1979); Delaney v. First Nat'l Bank, 386 P.2d 711, 714 (N.M. 1963) (citing courts from Florida, Illinois, Louisiana, Massachusetts and Pennsylvania); In re Hampton's Estate, 131 P.2d 565, 570 (Cal. Ct. App. 1942). See generally C.J.S. Adoption § 139. Even a century ago, when the Supreme Court considered whether Alabama improperly denied individuals adopted in Louisiana inheritance rights, the Court affirmed that the Full Faith and Credit Clause is not violated if a state "does not deny the effective operation of the [out-of-state adoption] proceedings." Hood v. McGehee, 237 U.S. 611, 615 (1915).[14] At issue here is a state statute providing for categorical non-recognition of a class of adoption decrees from other states, denying the "effective operation" of out-of-state adoption proceedings.

---

[14] Hood featured an Alabama statute that prohibited inheritance by children adopted through proceedings in other states. 237 U.S. at 614. Applying that statute, the adopted children were ineligible to take land in Alabama. "There is no failure to give full credit to the adoption of the plaintiffs, in a provision denying them the right to inherit land in another State. Alabama is sole mistress of the devolution of Alabama land by descent." Id. at 615. OSDH follows at least one other state, see Indus. Trust Co. v. Glanding, 38 A.2d 752, 754 (Del. Ch. 1944), in misconstruing Hood to mean that the Full Faith and Credit Clause does not require recognition of out-of-state adoptions.

We hold today that final adoption orders and decrees are judgments that are entitled to recognition by all other states under the Full Faith and Credit Clause. Therefore, Oklahoma's adoption amendment is unconstitutional in its refusal to recognize final adoption orders of other states that permit adoption by same-sex couples. Because we affirm the district court on this basis, we do not reach the issues of whether the adoption amendment infringes on the Due Process or Equal Protection Clauses.

We REVERSE the district court's order in this matter to the extent it held that the Magro-Finstuen plaintiffs had standing and directed OSDH to issue new birth certificates for the Magro-Finstuen plaintiffs. The order and judgment of the district court in all other respects is AFFIRMED.

06-6213, *Finstuen v. Crutcher*
06-6216, *Hampel v. Crutcher*

**HARTZ**, **J.**, concurring and dissenting.

Before us are two appeals. In one, No. 06-6216, the Hampel-Swaya plaintiffs appeal the dismissal of their claims for lack of standing. I join Judge Ebel's opinion affirming that they lack standing.

In the other appeal, No. 06-6213, the Oklahoma State Department of Health (OSDH) appeals the district court's judgment against it. OSDH named as appellees the Finstuen-Magro plaintiffs and the Doel plaintiffs. The Finstuen-Magro plaintiffs, however, have no dispute with the OSDH. Their claims were against the Governor and Attorney General, who have not appealed. As the joint answer brief filed on behalf of the Finstuen-Magro plaintiffs and the Doel plaintiffs states: "Heather Finstuen and Anne Magro did not request any relief of the Commissioner or the Department . . . ." Ans. Br. at 25 n. 10. Therefore, although I would set aside the district court's order requiring OSDH to issue birth certificates for their children (an action they do not oppose on appeal, *see id*.), I see nothing to address in this appeal regarding their standing, mootness, or the merits.

That leaves only the claims by the Doel plaintiffs. I agree with the panel majority that the Doel plaintiffs have Article III standing and that the appeal with respect to them is not moot. As for the merits, however, I see no need to address the constitutional issues. The OSDH concedes in its brief that the statute

challenged by the Doel plaintiffs does not preclude issuance of the birth certificates that they seek. Although the OSDH bases that view on its construction of the statute rather than on an agreement with the plaintiffs' constitutional arguments, I see no reason not to accept that concession for this appeal. In light of that concession, the only argument of OSDH for setting aside the district court's judgment is that other statutes prohibit issuance of the birth certificate. But OSDH did not raise that argument in district court, so we need not and should not consider it on appeal. Accordingly, we should affirm the judgment of the district court with respect to the Doel plaintiffs' claims against the OSDH.